**Wells Fargo Bank, N.A.**

**AGREEMENT DATE:** 07-17-2006
**ACCOUNT #:**
**REFERENCE #:**        20061797500088

# SmartFit Home Equity Account® Agreement
## and Disclosure Statement (the "Agreement")

**Borrower Name:** JAN L. MCQUAID And JAMES M. MCQUAID

**Property Address:** 11421 S IROQUOIS DR, PHOENIX, ARIZONA 85044

**Mailing Address for Billing Purposes (if different):** 11421 S IROQUOIS DR, PHOENIX, AZ 850442006

**Credit Line Limit:** 100,000.00

## SECTION 1: MY ACCOUNT AGREEMENT

In this Agreement, the words, "I," "me," "my," and "Borrower" (which also means "we," "us," "our," and "Borrowers," if more than one customer signs below) refer to each person who signs this Agreement. The words "you," "your," "Lender," and "the Bank" refer to Wells Fargo Bank, N.A. and any successor or assign or subsequent holder of this Agreement. This Agreement governs my SmartFit Home Equity Account® (the "Account") with the Bank. If more than one person signs this Agreement, we are jointly and individually bound by its terms. We are separately liable to the Bank for the entire amount owed on the Account. We are each liable as a principal and not merely as a guarantor, even if one or more of us does not use the Account.

## SECTION 2: SECURITY INTEREST

I am giving the Bank a deed of trust, mortgage or other security instrument including all modifications, addenda and amendments thereto (the "Security Instrument"), signed the same date as this Agreement. The Security Instrument gives you a security interest in the property located at the address shown above (the "Property").

## SECTION 3: MY SMARTFIT HOME EQUITY ACCOUNT®

My Account is a revolving account. My credit limit is shown above and will be displayed on each of my billing statements. During the Draw Period (described below), my available credit will be my credit limit minus the sum of all unpaid Advances posted to my Account. During the Draw Period, as I repay the principal balance I owe on my Account, my available credit will be replenished. I agree not to request an Advance that would cause my balance to exceed my credit limit. If at any time the balance of my Account exceeds my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

I may apply for an increase in my credit limit, and if I do so I agree to pay any application, appraisal and other fees, including increased costs for title insurance, as the Bank may require. If the Bank approves my application and increases my credit limit, I will provide and maintain such additional hazard insurance (including flood insurance, if necessary) and sign any additional documents as the Bank may require. All such increased credit

amounts will be governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

The Bank may from time to time in its sole discretion, approve additional credit for me under the terms of this Agreement. I will receive written notice from the Bank of any such offer to increase my credit limit. I may accept such offer of increased credit by my use of those additional funds and by signing any additional documents the Bank may require. All such increased credit amounts will be governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

## SECTION 4: MY ACCOUNT DURING THE DRAW PERIOD

### DRAW PERIOD
My Account has a Draw Period of 10 years from the date of this Agreement during which I may request Advances. At the end of the Draw Period, I may request that the Bank renew the Draw Period for an additional 10 years. The Bank may, at its option, approve my request to extend the Draw Period. I may not obtain Advances after the Draw Period ends.

When the Draw Period ends, the outstanding unpaid Line of Credit Advances will convert to a Final Fixed Rate Advance as detailed below in Section 5, MY ACCOUNT DURING THE REPAYMENT PERIOD.

### ADVANCES DURING THE DRAW PERIOD
There are 3 types of Advances on my Account:

- Fixed Rate Initial Advance
- Fixed Rate Advances
- Line of Credit Advances

The Bank must honor my request for a Fixed Rate Initial Advance and for subsequent Fixed Rate Advances and Line of Credit Advances (collectively, "Advances") as long as I am in compliance with all terms of this Agreement, including all modifications, addenda and amendments to it, and the Security Instrument.

As I use my Account, my available credit will be my credit limit minus the sum of all unpaid Advances. As I repay the principal balance I owe on my Account, my available credit will be replenished. I will not request an Advance that would cause the balance in my Account to exceed my credit limit, or which would violate the terms of this Agreement or any law. If I do exceed my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

I understand that the Bank may refuse to allow any Advance if the Advance does not comply with every requirement of this Agreement. The Bank may choose at its sole discretion to make an Advance that does not comply. The Bank may allow my Advances in any sequence convenient to the Bank.

The Bank is authorized to make an Advance from my Account when it receives a request given by any person who has signed this Agreement. If there are conflicting demands made by any of us who signed this Agreement, the Bank has the option to refuse to make any Advance that has not been requested by all of us together. The Bank will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when the Bank acts upon such instructions believing them to be genuine.

### FIXED RATE INITIAL ADVANCE
Any Advances made when you open my Account (or within 5 days thereafter) will be aggregated and treated as a single Fixed Rate Initial Advance. For purposes of this section, Account opening is considered to be the first day on which I may receive Advances (i.e., after any applicable rescission period). My Fixed Rate Initial Advance will have the fixed rate disclosed below and a term of 3 years. My Minimum Monthly Payment for the Fixed Rate Initial Advance shall be equal to the sum of all earned and unpaid periodic FINANCE CHARGES on the Fixed Rate Initial Advance.

At the end of the payment term for the Fixed Rate Initial Advance, any remaining balance from the Fixed Rate Initial Advance will be converted to a Line of Credit Advance.

## FIXED RATE INITIAL ADVANCE PERIODIC FINANCE CHARGES

Finance charges begin to accrue on the Fixed Rate Initial Advance immediately when funds are advanced. The periodic FINANCE CHARGE for a billing cycle is the sum of the periodic FINANCE CHARGE for each day in the billing cycle. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for the Fixed Rate Initial Advance (including current transactions) each day. To determine the daily balance, take the Fixed Rate Initial Advance balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement) and subtract any payments or credits that apply to the repayment of the Fixed Rate Initial Advance. The result is the daily balance.

The Daily Periodic Rate for the Fixed Rate Initial Advance is 0.021918% (corresponding **ANNUAL PERCENTAGE RATE** of 8.000%). The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE for the Fixed Rate Initial Advance will increase by one-quarter of one percentage point (0.25%) if the Automatic Payment feature described in Section 6 below is terminated for any reason. Therefore, the Daily Periodic Rate for the Fixed Rate Initial Advance may also increase when the Automatic Payment feature is terminated. Any increase in the rate will also result in an increase in my Fixed Rate Initial Advance Minimum Monthly Payment. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

## LINE OF CREDIT ADVANCES

Each Line of Credit Advance I request will be in the amount of $300 or greater.

## LINE OF CREDIT ADVANCE METHODS

While my Account is not in default, closed, or suspended, I may obtain a Line of Credit Advance by:

- Requesting a Line of Credit Advance in person at any Bank branch.
- Requesting a Line of Credit Advance by phone.
- Transferring funds by using Wells Fargo Online®
- In other ways the Bank authorizes from time to time.
- Obtaining a cash withdrawal or transferring funds by using my Wells Fargo ATM Card or Wells Fargo ATM & Check Card, if offered by the Bank and I select such service.
- Writing an Advance request check or draft which the Bank has provided to me.
- Using my EquityLine Platinum® card, if offered by the Bank and I select such service.

## LINE OF CREDIT ADVANCES PERIODIC FINANCE CHARGES

Finance charges begin to accrue on Line of Credit Advances immediately when funds are advanced. The periodic FINANCE CHARGE for a billing cycle is the sum of the periodic FINANCE CHARGE for each day in the billing cycle. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for Line of Credit Advances (including current transactions) each day. To determine the daily balance, take the Line of Credit Advances balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), add any new Line of Credit Advances, and subtract any payments or credits that apply to the repayment of Line of Credit Advances. The result is the daily balance.

The Daily Periodic Rate for Line of Credit Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Margin, the initial Daily Periodic Rate, and the initial ANNUAL PERCENTAGE RATE, are each disclosed below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE on my Line of Credit Advances will be adjusted the day after an Index change is published, using the new Index value. Therefore, the Daily Periodic Rate for Line of Credit Advances may change (increase or decrease) as often as once each day based on changes in the Index. The Margin will increase by one-quarter of one percentage point (0.25%) if the

Automatic Payment feature is terminated, as described in Section 6, below. Therefore, the Daily Periodic Rate for Line of Credit Advances may also increase at least once during the Account based on an increase in the Margin when the Automatic Payment feature is terminated. I understand that any increase may cause me to make larger monthly payments.

In addition, if the Automatic Payment feature is terminated, as described in Section 6, below, each of the Margin values identified above will increase by one-quarter of one percentage point (0.25%). Therefore, the Daily Periodic Rate for Line of Credit Advances may also increase at least once during the Account based on an increase in the Margin when the Automatic Payment feature is terminated. If the Margin increases, the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will also increase. I understand that any increase may cause me to make larger monthly payments.

## LIFETIME RATE CAP FOR LINE OF CREDIT ADVANCES
The Daily Periodic Rate for Line of Credit Advances will never exceed 0.049315% (corresponding **ANNUAL PERCENTAGE RATE** of 18.00%). This is the Lifetime Rate Cap for Line of Credit Advances.

## LIFETIME RATE FLOOR FOR LINE OF CREDIT ADVANCES
The Daily Periodic Rate for Line of Credit Advances will never fall below 0.011616% (corresponding **ANNUAL PERCENTAGE RATE** of 4.240%). This is the Lifetime Rate Floor for Line of Credit Advances.

## MY INITIAL RATE FOR LINE OF CREDIT ADVANCES
As discussed above, my Daily Periodic Rate is based on the value of the Index plus a Margin. The initial Index value that applies to my Account will be the value of the Index on the day I open my Account. The following disclosures are based on the value of the Index in effect on 07-17-2006. I understand that if I open my Account after this date, my actual Index value, Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE may be higher or lower than the rates disclosed below.

My Margin for Line of Credit Advances is equal to - TWO HUNDRED SIXTY ONE-THOUSANDTHS OF ONE PERCENTAGE POINT (-0.260%) (the "Margin"). As a result, unless the Lifetime Rate Cap for Line of Credit Advances or Lifetime Rate Floor for Line of Credit Advances require the Bank to apply a different rate to my Account, my initial Daily Periodic Rate is 0.021890% (corresponding **ANNUAL PERCENTAGE RATE** of 7.990%).

## LINE OF CREDIT ADVANCES MINIMUM MONTHLY PAYMENT
During the Draw Period, my Minimum Monthly Payment for Line of Credit Advances shall be equal to:

   The sum of all earned and unpaid periodic FINANCE CHARGES on Line of Credit Advances, plus credit insurance premiums, if any.

## FIXED RATE ADVANCES DURING THE DRAW PERIOD
I have the option to convert outstanding unpaid Line of Credit Advances to Fixed Rate Advances during the Draw Period based on credit limit availability. The minimum Fixed Rate Advance during the Draw Period is $10,000.

I may request up to 8 Fixed Rate Advances in addition to the Fixed Rate Initial Advance during the Draw Period. No more than 3 Fixed Rate Advances, including the Fixed Rate Initial Advance, may be outstanding at any one time. At the time I request a Fixed Rate Advance, I may select the repayment term for that Fixed Rate Advance. The repayment term must be a period of whole years and in the range described below:

| Fixed Rate Advance Amount | Term Range |
|---|---|
| $10,000 - 19,999.99 | 5 to 15 years |
| $20,000 - 49,999.99 | 5 to 30 years |
| $50,000 and above | 7 to 30 years |

## FIXED RATE ADVANCE METHODS DURING THE DRAW PERIOD

While my Account is not in default, closed, or suspended, I may obtain a Fixed Rate Advance by:

- Requesting a Fixed Rate Advance in person at any Branch bank
- Requesting a Fixed Rate Advance by phone

## FIXED RATE ADVANCES PERIODIC FINANCE CHARGES DURING THE DRAW PERIOD

Fixed Rate Advances will accrue periodic FINANCE CHARGES beginning on the day that the Bank converts any Line of Credit Advances to a Fixed Rate Advance. I will be charged a periodic FINANCE CHARGE on all outstanding unpaid Fixed Rate Advances each day at a fixed Daily Periodic Rate. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for the Fixed Rate Advance (including current transactions) each day. To determine the daily balance for the Fixed Rate Advance, take the Fixed Rate Advance balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), and subtract any payments or credits that apply to the repayment of the Fixed Rate Advance. The result is the daily balance.

The Daily Periodic Rate for Fixed Rate Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the value of the Index in effect on the last business day preceding the day the Bank receives my request for a Fixed Rate Advance. The Margin for Fixed Rate Advances is eight percentage points (8.0%). The Bank may, in its sole discretion, apply a lower Margin. The corresponding ANNUAL PERCENTAGE RATE for Fixed Rate Advances will never be more than the Lifetime Rate Cap for Fixed Rate Advances shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Margin for any existing Fixed Rate Advances will increase by one-quarter of one percentage point (0.25%) if the Automatic Payment feature is terminated, as described in Section 6, below. Therefore, the Daily Periodic Rate for Fixed Rate Advances may also increase at least once during the Account based on an increase in the Margin when the Automatic Payment feature is terminated. Any such increase will result in an increase in the then outstanding Fixed Rate Advance Minimum Monthly Payments, each of which will be reset at an amount sufficient to repay the remaining balance of the Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at its applicable corresponding ANNUAL PERCENTAGE RATE.

## LIFETIME RATE CAP FOR FIXED RATE ADVANCES DURING THE DRAW PERIOD

The Daily Periodic Rate for Fixed Rate Advances will not exceed 0.0493% (corresponding **ANNUAL PERCENTAGE RATE** of 18.000%). This is the Lifetime Rate Cap for Fixed Rate Advances.

## FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD

During the Draw and Repayment Periods, my Minimum Monthly Payment for each Fixed Rate Advance will be equal to the amount of principal plus periodic FINANCE CHARGE sufficient to repay the Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at the applicable corresponding ANNUAL PERCENTAGE RATE. This assumes that all payments will be made on their due dates, which will be the same as the due dates for my Line of Credit Advances Minimum Monthly Payment described above. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher. During the Draw Period, my available credit for new Line of Credit Advances will be replenished by the amount of principal I repay on my Fixed Rate Advances.

## MY TOTAL PAYMENT DUE DURING THE DRAW PERIOD

I will receive monthly billing statements from the Bank. I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Draw Period consists of my Fixed Rate Initial Advance Minimum Monthly Payment plus my Line of Credit Advances Minimum Monthly Payment plus my Fixed Rate Advances Minimum Monthly Payment(s) together with all past due amounts and overlimit amounts and all other charges due.

## SECTION 5: MY ACCOUNT DURING THE REPAYMENT PERIOD

### REPAYMENT PERIOD
I understand that I may not receive new Advances after the Draw Period ends. At that time, I will begin the Repayment Period, which will continue until the Maturity Date described below, but in no event more than 30 years.

### REPAYMENT OF OUTSTANDING FIXED RATE ADVANCES
During the Repayment Period, I will continue to make any Fixed Rate Advance Minimum Monthly Payments that were in effect at the end of the Draw Period. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher.

### REPAYMENT OF FINAL FIXED RATE ADVANCE
At the end of the Draw Period, the outstanding unpaid Line of Credit Advances balance will be converted into a final Fixed Rate Advance (the "Final Fixed Rate Advance"). The Final Fixed Rate Advance will have a term of 15 years if my total unpaid Line of Credit Advances balance is less than $20,000, or 30 years if my total unpaid Line of Credit Advances balance is $20,000 or more (unless I request a shorter term).

The Final Fixed Rate Advance Minimum Monthly Payment will be the greater of $100 or an amount sufficient to repay the Final Fixed Rate Advance balance by the end of the scheduled term in substantially equal, fully amortizing monthly payments of principal and periodic FINANCE CHARGE at the applicable corresponding ANNUAL PERCENTAGE RATE. If my payments are not consistently made when due, the Final Fixed Rate Advance Minimum Monthly Payment may not fully repay the Final Fixed Rate Advance over its term and my final payment for the Final Fixed Rate Advance may be higher. The Bank will notify me in advance of any changes to my Total Payment Due as a result of the Final Fixed Rate Advance Minimum Monthly Payment.

### PERIODIC FINANCE CHARGE ON FINAL FIXED RATE ADVANCE BALANCE
Periodic FINANCE CHARGES on my Final Fixed Rate Advance balance will begin to accrue on the first day of the Repayment Period. I will be charged a periodic FINANCE CHARGE based on the unpaid Final Fixed Rate Advance balance at the end of each day at a fixed Daily Periodic Rate.

The Daily Periodic Rate for the Final Fixed Rate Advance is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the Index value published on the last business day during the Draw Period. The Margin for the Final Fixed Rate Advance is eight percentage points (8.0%). The Bank may, in its sole discretion, apply a lower Margin. The corresponding ANNUAL PERCENTAGE RATE on my Final Fixed Rate Advance will never be more than the Lifetime Rate Cap for Fixed Rate Advances shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Margin for the Final Fixed Rate Advance will increase by one-quarter of one percentage point (0.25%) if the Automatic Payment feature is terminated, as described in Section 6, below, during the Repayment Period. Therefore, the Daily Periodic Rate for the Final Fixed Rate Advance may also increase at least once during the Repayment Period based on an increase in the Margin when the Automatic Payment feature is terminated. Any such increase will result in an increase in the then outstanding Final Fixed Rate Advance Minimum Monthly Payment, which will be reset at the greater of $100 or the amount sufficient to repay the remaining balance of the Final Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at its applicable corresponding ANNUAL PERCENTAGE RATE.

### LIFETIME RATE CAP FOR MY FINAL FIXED RATE ADVANCE
The Daily Periodic Rate for my Final Fixed Rate Advance will not exceed 0.0493% (corresponding **ANNUAL PERCENTAGE RATE** of 18.000%). This is the Lifetime Rate Cap for my Final Fixed Rate Advance.

### MY TOTAL PAYMENT DUE DURING THE REPAYMENT PERIOD
I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Repayment Period is the total of each Fixed Rate Advances Minimum Monthly Payment that is still due as the result of Fixed Rate Advances in effect on the day before the end of the Draw Period, plus the Final Fixed Rate Advance Minimum Monthly Payment as described above, together with all past due amounts and overlimit amounts and all other charges due.

## MATURITY DATE

The Maturity Date on my Account shall be the latest maturity date of any Fixed Rate Advance or the Final Fixed Rate Advance, but in no event more than 30 years from the end of the Draw Period. At that time, any remaining balance must be paid in full.

## SECTION 6:  AUTOMATIC PAYMENT DISCOUNT

I have chosen to make Automatic Payments as specified in the Authorization for Automatic Transfer. I have received an interest rate discount for making this choice. I understand that the ANNUAL PERCENTAGE RATE and the Margin that apply to my Line of Credit Advances, as described in Section 4 above, reflect a discount you gave me for this Authorization for Automatic Transfer. If the Automatic Payments are terminated for any reason at any time during the Draw Period by anyone, the Margin that applies to my Line of Credit Advances, as set forth in Section 4 above, will increase by one quarter of one percentage point (0.25%) effective the day the Automatic Payments are terminated. If the Margin increases, the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE applicable to my Line of Credit Advances, and my Line of Credit AdvancesMinimum Monthly Payment, may also increase. My monthly billing statement will show me my new Daily Periodic Rate, corresponding ANNUAL PERCENTAGE RATE and Line of Credit Advances Minimum Monthly Payment as applicable.

In addition, if the Automatic Payment feature is terminated at any time by anyone, for any reason, during the Draw or the Repayment Period, then the corresponding ANNUAL PERCENTAGE RATE on any outstanding Fixed Rate Initial Advance, Fixed Rate Advance and/or Final Fixed Rate Advance will be subject to a one time increase of one-quarter of one percentage point (0.25%), effective the day the Automatic Payments are terminated. If this happens, my Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE for any outstanding Fixed Rate Initial Advance, Fixed Rate Advance and Final Fixed Rate Advance will increase, causing an increase in my Minimum Monthly Payments for each of my then outstanding Fixed Rate Initial Advance, Fixed Rate Advances and the Final Fixed Rate Advance. The Fixed Rate Initial Advance Minimum Monthly Payment will equal the sum of all earned and unpaid periodic FINANCE CHARGES on the remaining balance of the Fixed Rate Initial Advance at the increased corresponding ANNUAL PERCENTAGE RATE. Each Fixed Rate Advance Minimum Monthly Payment will be reset at an amount sufficient to repay the remaining balance of the applicable Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at its increased corresponding ANNUAL PERCENTAGE RATE. The Final Fixed Rate Advance Minimum Monthly Payment will be reset at the greater of $100 or the amount sufficient to repay the Final Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at its increased corresponding ANNUAL PERCENTAGE RATE. My monthly billing statement will show me my new Daily Periodic Rate, corresponding ANNUAL PERCENTAGE RATE, the new Fixed Rate Initial Advance Minimum Monthly Payment, new Fixed Rate Advance Minimum Monthly Payments and the new Final Fixed Rate Advance Minimum Monthly Payment.

## SECTION 7:  OTHER FINANCE CHARGES

In addition to paying periodic FINANCE CHARGES, as described in Sections 4 and 5 above, I also agree to pay the following additional fees, each of which is a **FINANCE CHARGE**:

## ANNUAL FEE

Beginning three years after the date of this Agreement, and continuing each year of the Draw Period, whether or not I use the Account, I will pay a $75.00 non-refundable annual fee. I will not have to pay an annual fee if my Account is open (has not been closed or suspended under Section 17 or 18 below) and the average daily balance in my Account is $20,000 or greater for the 12 monthly billing cycles up to and including my anniversary month. For the purpose of making this determination, the Bank will add the average daily balances for Line of Credit

Advances and Fixed Rate Advances from the previous 12 monthly billing cycles and divide the total by 12.

## SECTION 8: CLOSING COSTS

I agree to pay to the Bank the following closing costs at the opening of my Account:

N/A

The following closing costs are **FINANCE CHARGES**:

N/A

## SECTION 9: ADDITIONAL FEES, COSTS AND CHARGES

In addition to the FINANCE CHARGES and closing costs described above, I agree to pay the following non-refundable fees, costs and charges, which will be owed once charged to my Account.

### LATE CHARGES

During the Draw Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the Line of Credit Minimum Monthly Payment if my payment is more than 10 days past due.

During the Repayment Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the sum of all Fixed Rate Advance Minimum Monthly Payments if my payment is more than 10 days past due.

### PREPAYMENT FEE

I agree to pay a prepayment fee of $500.00. This fee will be due and payable in full at any time within the first 3 years from the date of this Agreement if I close my Account (for any reason other than default due to non-payment, casualty loss, refinance with you or your affiliate, or termination by the Bank). If my Account remains open (is not closed or suspended under Section 17 or 18 below) for more than 3 years from the date of this Agreement, no prepayment fee will be assessed. No tender of a prepayment of all amounts due under this Agreement shall be effective unless and until such prepayment is accompanied by the applicable prepayment fee.

### OTHER CHARGES

To the extent allowed by law, I agree to pay the following fees if I request or authorize these additional services:
(a) **Fax Fee**: The Bank will charge a fax fee in the amount of ten dollars ($10.00) if I request or authorize others to request any document or letter to be transmitted by facsimile (fax) machine.
(b) **Research Fee and Photocopy Fee**: The Bank will charge a research/photocopy fee in the amount of five dollars ($5.00) per photocopy if I request or authorize others to request that the Bank research my Account or provide photocopies of Account documents for any purpose other than a billing error inquiry.
(c) **Reconveyance or Satisfaction Fee**: The Bank will charge reconveyance and satisfaction fees as allowed by applicable law.
(d) **Stop Payment Fee**: The Bank will charge a stop payment fee in the amount of twenty-five dollars ($25.00) if I request or authorize others to request that the Bank stop payment on a draft I have used to request a Line of Credit Advance.
(e) **Return Check Fee**: The Bank will charge a return check fee in the amount of twenty-five dollars ($25.00) if I make a payment with a check that is dishonored for any reason.
(f) **Overlimit Fee**: The Bank will charge an overlimit fee in the amount of twenty-five dollars ($25.00) for each billing cycle in which I have exceeded my credit limit or have requested an Advance that would have caused me to exceed my credit limit.
(g) **Return Advance Check Fee (insufficient funds)**: The Bank will charge a return advance check fee in the amount of twenty-five dollars ($25.00) for each check or draft used to request a Line of Credit Advance that is returned unpaid (dishonored) by the Bank due to the requested Advance not meeting all requirements of this Agreement.

## SECTION 10: COLLECTION COSTS AND ATTORNEY'S FEES

If I am in default, I will pay the Bank's collection costs, attorney's fees and other expenses of enforcing the Bank's rights under this Agreement and the Security Instrument, unless prohibited by applicable law.

## SECTION 11: METHOD OF PAYMENT

Depending on my chosen method of payment, the Bank will do one of the following each monthly billing cycle, during both the Draw and Repayment Periods:

**Automatic Payments:** Provide me with a monthly billing statement and automatically charge my qualified deposit account (under the terms of a separate written Authorization for Automatic Transfer) for the Total Payment Due. Other charges due as shown on my monthly billing statement, other than credit insurance premiums and annual fees, if any, must be paid separately by me. However, if I have past due amounts on my Account, the Bank will not use an Automatic Payment to collect these amounts and all amounts due as shown on my monthly billing statement must be paid separately by me.

## SECTION 12: SCHEDULED PAYMENT DUE DATE

My monthly payment due date for my Total Payment Due is the 28TH day of each and every month during both the Draw and Repayment Periods.

## SECTION 13: MY PROMISE TO PAY

I promise to pay to the order of the Bank the total of all Advances which I receive or which I authorize to be made from my Account. I promise to pay the total of any FINANCE CHARGE, plus all amounts past due, overlimit amounts, and any late charges, fees, other charges and other obligations charged to my Account under this Agreement or the Security Instrument. All payments made under this Agreement will be made in U.S. Dollars. I will not mail any cash payments to the Bank. I may not use Advance request checks to make payments on my Account.

The Bank may, at its discretion, withhold a portion of the available credit on my Account up to the amount of any payment due in order to assure that my check or other payment instrument is honored.

I will make payments at the Bank's address for receiving a payment, as indicated on my payment coupon and billing statement, unless another payment method is authorized by the Bank. Each non-electronic payment I make will be accompanied by the remittance portion of my billing statement.

I understand that payments I make by mail to the address indicated on my billing statement or payment coupon will be credited to my Account as of the date received (including Saturdays, Sundays, and holidays) if the Bank receives the payment prior to 5 p.m. local time for the payment address.

Payments I make from a qualified account ("Automatic Payments") pursuant to an Authorization for Automatic Transfer will be credited to my Account on the date received (including Saturdays, Sundays, and holidays).

Payments I make at a Bank branch and received prior to established cut-off times will be credited to my Account on the business day the payment is received by the Bank. For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and Bank observed holidays. Payments made at a Bank branch received on a Saturday, Sunday, or Bank observed holiday or after established cut-off times will be credited as of the next business day.

Payments I make online, by ATM, by telephone, or by any other means the Bank may make available to me and received prior to established cut-off times will be credited to my Account on the business day the payment is received by the Bank. For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and federal holidays. Payments made online, by ATM, by telephone, or by any other means the Bank may make available to me received on a Saturday, Sunday, or federal holiday or after established cut-off times will be

credited as of the next business day.

I will not make payment or authorize others to make payment for me by means of a single aggregated payment, which includes payments for this Account and any other account(s), unless the payment is made in compliance with the Bank's requirements for multiple account payments.

The Bank may accept late payments, partial payments, post-dated checks, or any form of payment containing a restrictive endorsement, without losing any of the Bank's rights under this Agreement. The Bank's acceptance of checks or money orders labeled "payment in full," or words to that effect, will not constitute an accord and satisfaction nor a waiver of any rights the Bank has to receive full payment. If I intend to condition a payment, pay the Account in full with less than the total amount owed, or give payment instructions, I will clearly set out such intention, conditions and instructions in a separate letter accompanying my payment, and mail both to Wells Fargo Bank, N.A., P.O. Box 2993, Portland, OR 97208.

## SECTION 14:  TAX DEDUCTIBILITY

I understand that I should consult a tax advisor regarding the deductibility of interest and charges under my Account.

## SECTION 15:  REEVALUATION OF CREDIT QUALIFICATIONS AND CREDIT REPORTS

My signature on this Agreement authorizes the Bank to obtain credit information about me, including credit bureau reports, at any time. Such credit bureau reports may be requested or used in connection with (a) renewal or extension of this Agreement, (b) review of my Account, (c) taking any collection action, or (d) any other legitimate purposes associated with my Account.  I agree to submit current financial information to the Bank upon the Bank's request. The Bank may reexamine and reevaluate my credit qualifications at any time. The Bank may report its experience with me and my Account to others, to the extent allowed by law.

## SECTION 16:  PAYOFF BALANCE INFORMATION

The Bank will tell me the balance required on any given day to pay off my Account in full, if I so request.  If such request is made on my behalf by an escrow holder, settlement agent or other third party on my behalf during the Draw Period, the Bank may immediately freeze my Account. I agree that the Bank's receipt of such a request from an escrow holder, settlement agent or other third party on my behalf will be considered to be a request by me to suspend credit privileges on my Account.  While my Account is frozen, I cannot receive new Advances and the Bank will return unpaid any Advance request checks the Bank receives and will refuse to honor any other Advance request made on my Account.  This payoff freeze will be lifted and my Account reopened if the request for payoff balance information is withdrawn and the Bank has received written confirmation from the escrow holder, settlement agent or other third party on my behalf that the escrow or other settlement has been cancelled.

## SECTION 17:  DEFAULT

I will be in default if (a) I fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is fraud or material misrepresentation by me in connection with this Agreement, or (c) any action or inaction by me adversely affects the Bank's security in the Property, including without limitation, transfer of the Property without the Bank's consent, failure to maintain required insurance or pay required taxes, revocation or termination of any revocable trust that is an owner of the Property, or the death of any person who has signed this Agreement, or (d) I am an executive officer of the Bank and federal law governing credit extended by a bank to its executive officer, including without limitation Section 215.5(d)(4) of Federal Reserve Regulation O (12 CFR § 215.5(d)(4)), permits or requires immediate payment of my entire Account balance.

If I am in default, the Bank, subject to applicable law, may do any or all of the following. (a) close my Account immediately, without notice; (b) return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account; and (c) require immediate payment of the

entire balance of my Account, and, if I fail to pay, exercise the Bank's rights under the Security Instrument, which may result in the loss of the Property. If I am in default, the method of determining the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will remain as described in this Agreement.

The Bank and I agree that notwithstanding any other provision of this Agreement or the Security Instrument, the Bank will have the right to terminate or suspend my Account to the extent permitted by applicable law.

## SECTION 18: CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT; REINSTATEMENT OF CREDIT

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BORROWER

Any one Borrower can close the Account by paying in full and sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting that the Account be closed. Any one Borrower may terminate the Advance feature, at any time during the Draw Period, by sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting the termination of the Advance feature. To reactivate the Advance feature on the Account during the Draw Period, the Bank will require all Borrowers to sign a written request and mail to the address indicated on my monthly billing statement.

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BANK

I will receive a written notice if the Bank suspends or freezes my Account or reduces my credit limit as required under applicable law. The notice will include the reason(s) for such action(s). Thereafter, if I wish to reinstate my Account or increase my credit limit, I agree to send a written request to the Bank at the address specified on my monthly billing statement, signed by all of the Borrowers, along with satisfactory evidence to the Bank that the reason(s) for suspension or reduction of my Account no longer exist(s). I also agree to provide the Bank promptly with any additional information necessary to support my request.

The Bank may suspend the use of my Account and temporarily prohibit future Advances during the Draw Period, or the Bank may reduce my credit limit, for any reason permitted by applicable law, including without limitation, (a) if the annualized Daily Periodic Rate equals or exceeds the Lifetime Rate Cap stated herein, (b) there is any material change in my financial circumstances that the Bank reasonably believes will make me unable to fulfill my repayment obligations under this Agreement, (c) the value of the Property declines significantly below its original appraised value, as determined by the Bank, (d) my failure to comply with any material obligation under this Agreement or the Security Instrument, (e) a regulatory authority has notified the Bank that continued Advances would constitute an unsafe and unsound business practice, (f) I am in default under Section 17 above, or (g) government action prevents the Bank from imposing the ANNUAL PERCENTAGE RATE provided for in this Agreement or impairs the Bank's security interest in the Property, such that the value of the security interest is less than 120 percent of the credit limit.

In the event of a suspension of my Account, the Bank is authorized to obtain such information as may be required by the Bank, including without limitation, credit reports and appraisals of the Property, to evaluate any request by me to reinstate the Account. To the extent permitted by applicable law, I agree to pay to the Bank the cost of obtaining such additional information.

If my Account is closed or suspended for any reason, the Bank may return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account. I will continue to be responsible for full payment of the balance of my Account as well as all other Account obligations, according to the terms of this Agreement.

## SECTION 19: FURTHER ASSURANCES

I agree that I will take any steps, including but not limited to, signing, filing or recording any documents, which are necessary or which the Bank deems appropriate, to be sure that my obligations to the Bank under this Agreement become and continue to be secured by the Security Instrument.

## SECTION 20: CHANGE IN RESIDENCE OR OWNERSHIP OF THE PROPERTY

I agree to notify the Bank immediately if (a) the Property is my primary residence and I cease to live in the Property as my primary residence, or (b) there is any change in the ownership of the Property. I agree that my Account shall be closed and that the entire outstanding balance of my Account shall be due and payable immediately on any sale or other transfer of the Property, unless prohibited by applicable law. In this regard, I understand that my Account is secured by a Security Instrument containing the following or a substantially similar provision:

> Upon sale, transfer, hypothecation, assignment or encumbrance, whether voluntary, involuntary, or by operation of law, of all or any part of the Property or any interest therein, then at its sole option, the Bank may, by written notice to Trustor (or Grantor or Mortgagor), declare all obligations secured hereby immediately due and payable, except to the extent that such acceleration and in such particular circumstances where exercise of such a right by the Bank is prohibited by law.

## SECTION 21: CHANGE IN TERMS

To the extent allowed by law, I agree that the Bank may make certain changes to the terms of this Agreement at specified times or upon the occurrence of specified events. The Bank may make insignificant changes, such as changes in the address for payments, billing cycle dates, payment due dates, day of the month on which Index values are determined, Index or interest rate rounding rules, and balance computation method (if the change produces an insignificant difference in the interest or FINANCE CHARGE I am required to pay). The Bank may also make changes that will benefit me, such as additional options or a temporary reduction in rates or fees. In accordance with federal law, the Bank may also change the Index and Margin used to determine the ANNUAL PERCENTAGE RATE(S) that apply to my Line of Credit Advances and/or Fixed Rate Advances if the original Index is no longer available. The Bank may make any of the changes discussed above without my consent, unless applicable law provides otherwise. The Bank will give me any notice of change that is required by law. I may also agree to changes in writing.

## SECTION 22: WAIVERS

### BORROWER'S WAIVERS
I waive my rights to require the Bank to do certain things. Those things are: (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an official certification of nonpayment (known as "protest"). Anyone else who agrees to keep the promises made in this Agreement, or who agrees to make payments to the Bank if I fail to keep my promises under this Agreement, or who signs this Agreement to transfer it to someone else, waives these rights. These persons are known as "guarantors, sureties and endorsers."

### BANK'S NON-WAIVER
The Bank may fail to make use of any of its rights under this Agreement or the Security Instrument or under applicable law on one or more occasions, or delay or partially exercise such rights, without waiving any of its rights or amending any of my obligations. The Bank may fail to make use of any of its rights or delay or partially exercise such rights against one party, without waiving any of its rights against any other party to this Agreement.

## SECTION 23: GOVERNING LAW; SEVERABILITY

All interest, fees and other amounts charged or accruing in connection with this Agreement which are considered "interest" within the meaning of Section 85 of the National Bank Act (12 USC § 85; 12 CFR 7.4001(a)) shall be governed by and interpreted under South Dakota law. In all other respects, this Agreement and all related documents, as well as the rights, remedies, and duties of the Bank and the Borrower(s), shall be governed and interpreted by federal law with respect to national banks and, to the extent not preempted by federal law, the laws of the state in which the Property is located.

If any provision of this Agreement or the Security Instrument is determined to be invalid or unenforceable as the

result of arbitration pursuant to Section 24 below or as the result of any court proceeding permitted under Section 24 below, the rest of this Agreement will remain in full force and effect and enforceable according to its terms. All references in this Agreement to the singular shall include the plural and vice versa.

## SECTION 24: ARBITRATION

If I have a dispute with the Bank, and I am not able to resolve the dispute informally, I agree that any dispute, regardless of when it arose, shall be resolved by the following arbitration process. **I understand and agree that both myself and the Bank are each waiving the right to a jury trial or a trial before a judge in a public court.**

### DISPUTES

A dispute is any unresolved disagreement between me and the Bank. It includes any dispute relating in any way to accounts or services described in this Agreement; to my use of any Bank location or facility; or to any means I may use to access the Bank, such as an automated teller machine (ATM) or on-line Internet banking. It includes claims based on broken promises or contracts, torts (injuries caused by negligent or intentional conduct) or other wrongful actions. It also includes statutory, common law and equitable claims. A dispute also includes any disagreement about the meaning of these Arbitration provisions, and whether a disagreement is a "dispute" subject to binding arbitration as described in these Arbitration provisions. **A dispute does not include a claim that may be filed in small claims court. If I have a dispute that is within the jurisdiction of the small claims court, I agree to file my claim there.**

### BINDING ARBITRATION

Binding arbitration is a means of having an independent third party resolve a dispute without using the court system, judges or juries. Either the Bank or I may require the submission of a dispute to binding arbitration at any reasonable time notwithstanding that a lawsuit or other proceeding has been commenced. If either party fails to submit to binding arbitration following a lawful demand, the one who fails to so submit bears all costs and expenses incurred by the other compelling arbitration. **Neither I nor the Bank shall be entitled to join or consolidate disputes by or against others in any arbitration, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.** Each arbitration, including the selection of the arbitrator(s) shall be administered by the American Arbitration Association (AAA), according to the Commercial Arbitration Rules and the Supplemental Procedures for Consumer Related Disputes ("AAA Rules"). To the extent that there is any variance between the AAA Rules and these Arbitration provisions, these Arbitration provisions shall control. Arbitrator(s) must be members of the state bar where the arbitration is held, with expertise in the substantive laws applicable to the subject matter of the dispute.

The Bank and I each agree that in this relationship:

- The Bank and I are participating in transactions involving interstate commerce;
- Each arbitration is governed exclusively by the provisions of the Federal Arbitration Act (Title 9 of the United States Code).

To find out how to initiate an arbitration proceeding, a party may call any office of the AAA or visit the AAA online at www.adr.org.

### RIGHTS PRESERVED

These Arbitration provisions and the exercise of any of the rights I and the Bank have under these Arbitration provisions do not stop me or the Bank from exercising any lawful rights to use other remedies available to preserve, foreclose or obtain possession of real or personal property; exercise self-help remedies, including setoff and repossession rights; or obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment or the appointment of a receiver by a court having jurisdiction.

### MISCELLANEOUS

The Bank and I each agree to take all steps and execute all documents necessary for the implementation of arbitration proceedings. The arbitrator may hear and rule on appropriate dispositive motions as part of the arbitration proceeding, such as motions for judgments on the pleadings, summary judgment or partial summary

judgment. The AAA, the arbitrators, the Bank and I must, to the extent feasible, take any necessary action to assure that an arbitration proceeding, as described in these Arbitration provisions, is completed within 180 days of filing the dispute with the AAA, unless otherwise determined by the arbitrator. These parties must not disclose the existence, content or results of the arbitration, except for disclosures of information required in the ordinary course of business or permitted by applicable law or regulation. This requirement shall be liberally construed in order to ensure the enforcement of these provisions. Arbitration proceedings are conducted in the state in which I opened my account or at a location determined by the AAA.

All statutes of limitations applicable to any dispute apply to any arbitration between me and the Bank. These Arbitration provisions shall survive termination, amendment or expiration of my account relationship or the governing account agreement or any other relationship between me and the Bank. These Arbitration provisions constitute the entire agreement between the parties and supersede all prior arrangements and other communications concerning dispute resolution. If more than one arbitration agreement entered into by me and the Bank is potentially applicable to a dispute, the one most directly related to the account or transaction that is the subject of the dispute shall control.

## FEES AND EXPENSES OF ARBITRATION

I agree to pay the applicable AAA filing fee when I submit my written request for arbitration to the AAA. The AAA's filing fee and administrative expenses for an arbitration on documents alone without oral hearing, will be allocated according to the AAA Rules, except that for claims of less than $1,000, I will only be obligated to pay a filing fee of $15 and the Bank will pay all of the AAA's other costs and fees. At my written request, the Bank will temporarily advance up to $500 towards the filing, administrative and/or hearing fees for any dispute in excess of $1,000 which I may file against the Bank, after I have paid an amount equivalent to the fee, if any, for filing a claim for such a dispute in state or federal court (whichever is less) in the judicial district in which I reside. However, if I elect an in-person arbitration process, I must pay my share of the higher administrative fee and the additional costs for this process. At the conclusion of the arbitration, the arbitrator will decide who will ultimately be responsible for paying the filing, administrative and/or hearing fees in connection with the arbitration including, but not limited to, those costs and fees paid by the Bank on my behalf. Unless inconsistent with applicable law, each party shall bear the expense of that party's own attorneys', experts' and witness fees, regardless of which party prevails in the arbitration.

## SECTION 25: LOST OR STOLEN ADVANCE REQUEST CHECKS; BILLING ERRORS

### LOST OR STOLEN ADVANCE REQUEST CHECKS (WHERE AVAILABLE); BILLING ERRORS

I will immediately contact the Bank at the phone number on my monthly billing statement and confirm by letter if any of my Advance request checks are ever lost or stolen, if there are any errors in my monthly billing statement, or if I suspect any unauthorized use of my Account.

The Bank will not return to me my cancelled Advance request checks or other Advance request instruments after paying them. The Bank will make available photocopies of my Advance request checks and other Advance request instruments upon request. I will examine my Account statements promptly in order to identify any improper or unauthorized entries. In consideration for the Bank's payment of each Advance request check, I agree that even though I will not receive the original Advance request checks, all time periods under the Uniform Commercial Code (UCC) for examining my monthly billing statement and reporting improper entries, including the UCC's statutes of limitation with respect to forged, unauthorized, or missing signatures or endorsements, will begin from the time my Account statement is first sent or made available to me.

### UNAUTHORIZED TRANSACTIONS

I will notify the Bank if someone has transferred, or may transfer money from my Account without my permission, or if I suspect any fraudulent activity on my Account. I can call the Wells Fargo Phone Bank at the telephone number on my monthly billing statement, anytime, 24 hours a day, 7 days a week, or advise my local Bank branch office. I may also send written notice to the Bank at the address indicated on my billing statement.

### Billing Rights - Keep This Notice For Future Use

This notice contains important information about my rights and the Bank's responsibilities under the Fair Credit

Billing Act.

## Notify The Bank In Case Of Errors Or Questions About My Bill

If I think my billing statement is wrong, or if I need more information about a transaction on my billing statement, I will send a letter on a separate page to the Bank, as soon as possible, at the address listed on my billing statement. The Bank must hear from me no later than 60 days after the Bank sent me the first billing statement on which the suspected error or problem appears. I can telephone the Bank, but doing so will not preserve my rights.

In my letter, I will provide the Bank with the following information:

- My name, Account number and daytime phone number, and
- The dollar amount of the suspected error, and
- A description of the error and explanation, if possible, as to why I believe there is an error. If I need more information, I will describe the item I am not sure about.

If I have authorized the Bank to pay my minimum monthly payment automatically from my checking account at the Bank, I can stop the payment of any scheduled automatic payment if I believe a billing error has occurred. To stop the payment, my letter must reach the Bank at least three business days before the automatic payment is scheduled to occur.

## My Rights And The Bank's Responsibilities After Receipt Of My Written Notice

The Bank must acknowledge my letter within 30 days, unless the Bank has corrected the error by then. Within 90 days, the Bank must either correct the error or explain why the Bank believes the billing statement was correct.

After the Bank receives my letter, the Bank cannot try to collect any amount I question, or report me as delinquent. The Bank can continue to bill me for the amount I question, including finance charges, and the Bank can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while the Bank is researching my Account, but I am still obligated to pay the parts of my bill that are not in question.

If the Bank finds that a mistake was made on my billing statement, I will not have to pay any finance charges related to the questioned amount. If the Bank didn't make a mistake, I will have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, the Bank will send me a statement of the amount I owe and the date that payment is due.

If I fail to pay the amount that the Bank determines I owe, the Bank may report me as delinquent. However, if the Bank's explanation does not satisfy me and I write to the Bank within ten days telling the Bank that I still refuse to pay, the Bank must tell anyone the Bank reports me to that I have a question about my bill. And, the Bank must tell me the name of anyone the Bank reports me to. When the matter has been settled between the Bank and me, the Bank must tell anyone the Bank reports me to that the matter has been settled.

If the Bank does not follow the above rules, the Bank cannot collect the first $50 of the questioned amount, even if my billing statement was correct.

## Special Rule For Credit Card Purchases

If I have a problem with the quality of property or services that I purchased with the Credit Card (defined in Section 27 below), and I have tried in good faith to correct the problem with the merchant, I may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a)     I must have made the purchase in my home state or, if not within my home state within 100 miles of my current mailing address; and

(b)     The purchase price must have been more than $50.

These limitations do not apply if the Bank owns or operates the merchant, or if the Bank mailed me the advertisement for the property or services.

## SECTION 26: NOTICES

Unless applicable law requires a different method, any notice that must be given to me or to anyone else who signs, guarantees or endorses this Agreement may be given by mailing it to my address as set forth above in this Agreement, or to a different address if I have properly notified the Bank of that different address. Any notice that I may send to the Bank must be given by mailing it to the Bank at the address provided on my billing statement, unless the type of notice is more specifically addressed in this Agreement and a different address is provided herein.

I agree that the Bank may contact me by telephone. I agree to accept calls from the Bank at any telephone number that I provide to the Bank.

## SECTION 27: EQUITYLINE PLATINUM® CARD ACCESS

### CREDIT CARD ACCESS
I hereby authorize the Bank to issue *EquityLine Platinum* card(s) (referred to as the "Credit Card" and collectively as the "Credit Cards") in the name of each Borrower who signs below. While the Account is not in default, closed or suspended, any Borrower may borrow money from the Account by use of the Borrower's Credit Card. If this is a joint Account, each Borrower is responsible for payment of the entire amount due resulting from the use of the Credit Card.

I understand that all Advances obtained by using the Credit Card will be Line of Credit Advances and not Fixed Rate Advances. If I want an Advance to be converted to a Fixed Rate Advance, I must advise the Bank directly in a separate communication.

Notwithstanding any default, termination or suspension of my Account, my right to use the Credit Card will terminate if and when my Account moves into the Repayment Period.

### FOREIGN CURRENCY TRANSACTIONS
If I engage in a transaction in a currency other than U.S. Dollars using an *EquityLine Platinum* card, then Visa International® ("VISA") will convert the charge to a U.S. Dollar amount. The exchange rate used to convert the currency to U.S. Dollars will be a rate selected by VISA from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate VISA itself receives, or the government-mandated rate in effect for the applicable central processing date. The currency conversion rate on the applicable central processing date may differ from the rate that would have been used on the date of the transaction or the date the transaction posted to my billing statement.

### BANK NOT RESPONSIBLE FOR REFUSAL TO HONOR CREDIT CARDS
The Bank is not responsible for the refusal of any merchant, bank or ATM to honor or accept the Credit Cards issued on my Account.

### AUTHORIZATIONS
Some transactions with the Credit Card will require prior approval. These prior approvals are called "authorizations." If the Bank's authorization system is not working fully or if the number of transactions exceeds the limit for a certain period of time, the Bank may not give or the Bank may be unable to give an authorization even though the transaction would not exceed my credit limit and my Account is in good standing. For security reasons, the Bank cannot explain the details of how the authorization system works. I agree that the Bank will not be liable for failing to provide an authorization.

### LOST OR STOLEN CREDIT CARDS
In addition to my other obligations to notify the Bank regarding billing errors and lost or stolen Advance request checks, I will immediately notify the Bank and confirm by letter if my Credit Card is ever lost or stolen or if another person has my Secret Code or Pin Number, if there are any errors on my monthly billing statement, or I suspect any unauthorized use of the Account and my Credit Card. I agree to assist the Bank in determining the facts, circumstances, and other pertinent information relating to any loss, theft, or possible unauthorized use of

my Credit Card. If my Account is in good standing, the Bank will send me a new Credit Card with a new account number to replace the Credit Card that was lost, stolen or wrongfully used. Although I will be issued a new account number, I will not be considered to have opened a new account, and my existing balance will be transferred to the replacement account number.

I may be liable for the unauthorized use of my Credit Card. I will not be liable for unauthorized use that occurs after I notify the Bank, orally or in writing, of the loss, theft, or possible unauthorized use. In any case, my maximum liability will not exceed $50. To notify the Bank of a lost or stolen Credit Card, or of unauthorized use of my Credit Card, I can either call the Bank at the telephone number on my monthly billing statement or at the number listed below anytime, 24 hours a day, 7 days a week, or I can advise my local Wells Fargo office followed by a written notice to:

Wells Fargo Bank, N.A., P.O. Box 4233, Portland, OR 97208-4233
Phone Number: 866-828-9430

## SECTION 28: ADDENDA

I agree to the following attached addenda, modifications or amendments:

N/A

## SECTION 29: STATE DISCLOSURES

N/A

THIS AGREEMENT, THE SECURITY INSTRUMENT AND THE CLOSING DOCUMENTS EXECUTED HEREWITH CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT OF THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS AGREEMENT.

### NOTICE TO THE BORROWER
DO NOT SIGN THIS AGREEMENT IF IT CONTAINS BLANK SPACES. ALL SPACES SHOULD BE COMPLETED BEFORE THIS AGREEMENT IS SIGNED. READ THIS AGREEMENT BEFORE SIGNING IT.

## ACKNOWLEDGMENT
I have received, read and retained a copy of this SmartFit Home Equity Account® Agreement and Disclosure Statement (the "Agreement"), the Security Instrument, the Agreement to Provide Insurance, and the HUD Settlement Statement provided to me at the closing, all of which I agree to by signing this Agreement. The HUD Settlement Statement is incorporated into and made a part of this Agreement. I acknowledge receipt of the SmartFit Home Equity Account® Important Terms disclosure and the home equity brochure when I applied for this Account. In addition, I hereby agree that the terms of this Agreement replace the terms of any prior oral or written agreements between the Bank and me about this Account, including, for example, any and all commitment letters and pre-approval letters between the Bank and me about this Account.

_Jan L McQuaid_ (Seal)  7-19-06
BORROWER  JAN L. MCQUAID                           DATE SIGNED

_James M McQuaid_ (Seal)  7-19-2006
BORROWER  JAMES M. MCQUAID                          DATE SIGNED



OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
2006-1084018 08/15/06 09:10 AM
8 OF 35

FLORESC

Recording requested by:
**Wells Fargo Bank, N.A.**
**MARIO A RAMIREZ**
**DOCUMENT PREPARATION**
**11601 N BLACK CANYON HWY**
**PHOENIX, ARIZONA 85029**
**866-537-8489**

After Recording Return To:
**Wells Fargo Bank, N.A.**
**Attn: Document Mgt.**
**P.O. Box 31557 MAC B6908-012**
**Billings, MT 59107-9900**

———————State of Arizona———————
**REFERENCE #: 20061797500088**

————Space Above This Line For Recording Data————
Account number:

# DEED OF TRUST
### (With Future Advance Clause)
### (Short Form)

1. **DATE AND PARTIES.** The date of this Short Form Deed of Trust ("Security Instrument") is <u>**JULY 17, 2006**</u> and the parties are as follows:

   TRUSTOR ("Grantor"): **JAMES M. MCQUAID AND JAN L. MCQUAID, WHO ACQUIRED TITLE AS JAMES MCQUAID AND  JAN L. MCQUAID, HUSBAND AND WIFE**

   whose address is: **11421 S IROQUOIS DR, PHOENIX, ARIZONA 85044-2006**

   TRUSTEE: **Wells Fargo Financial National Bank, c/o Specialized Services, PO Box 31557 Billings, MT 59107**

   BENEFICIARY ("Lender"): **Wells Fargo Bank, N.A., 101 North Phillips Avenue, Sioux Falls, SD 57104**

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Grantor's performance under this Security Instrument, Grantor irrevocably grants, conveys and sells to Trustee, in trust for the benefit of Lender, with power of sale, all of that certain real property located in the County of <u>**MARICOPA,**</u> State of Arizona, described as follows:

   **LOT 1761, AHWATUKEE RS-4, ACCORDING TO BOOK 185 OF MAPS, PAGE 19, RECORDS OF MARICOPA COUNTY, ARIZONA.**

AZDeed - short CDP.V1  (07/2002)

1/3

Documents Processed 07-17-2006, 15:10:42

with the address of at **11421 S IROQUOIS DR, PHOENIX, ARIZONA 85044** and parcel number of **301-55-743** together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above.

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed **$ 100,000.00**. This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of the promissory note, revolving line of credit agreement, contract, guaranty or other evidence of debt dated **JULY 17, 2006**, together with all amendments, extensions, modifications or renewals. The maturity date of the Secured Debt is **July 17, 2046.**
   B. All future advances from Lender to Grantor under such evidence of debt, whether obligatory or discretionary. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances which exceed the amount shown in Section 3. Any such commitment must be agreed to in a separate writing.
   C. All sums advanced and expenses incurred by Lender for insuring, preserving, or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

5. **RIDERS.** If checked, the following are applicable to this Security Instrument. The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.

   [N/A] Third Party Rider

   [N/A] Leasehold Rider

   [N/A] Other:   **N/A**

6. **MASTER FORM DEED OF TRUST.** By the delivery and execution of this Security Instrument, Grantor agrees that all provisions and sections of the Master Form Deed of Trust ("Master Form"), inclusive, dated **January 15, 2001**, and recorded on **May 7, 2001** as Number **2001-0379841** in Book **N/A** at Page **1—9** of the Official Records in the Office of the Recorder of **MARICOPA** County, State of Arizona, are hereby incorporated into, and shall govern, this Security Instrument. This Security Instrument does not incorporate any provision in the Master Form Mortgage that references a certain Home Equity Closing Handbook, such Handbook no longer being in existence.

**SIGNATURES:** By signing below, Grantor agrees to perform all covenants and duties as set forth in this Security Instrument. Grantor also acknowledges receipt of a copy of this document and a copy of the provisions contained in the previously recorded Master Form Deed of Trust (the Deed of Trust-Bank/Customer Copy).

_[signature]_                      7-19-06

Grantor   JAN L. MCQUAID                       Date

_[signature]_                      7.19-2006

Grantor   JAMES M. MCQUAID                   Date

Grantor                                          Date

Grantor                                          Date

Grantor                                          Date

Grantor                                          Date

Grantor                                          Date

Grantor                                          Date

**ACKNOWLEDGMENT:**
(Individual)

State of Arizona

County of **MARICOPA**

The foregoing instrument was acknowledged before me this __July 19__, 20 __06__ (date) by **JAN L. MCQUAID And JAMES M. MCQUAID**

(Name of person(s) acknowledged).

_[seal: DANIEL MEDINA — Notary Public - Arizona — Maricopa County — My Commission Expires — February 9, 2009]_

_[signature]_

(Signature of person taking acknowledgment)

**Notary Public**

(Title)

(Seal)

My commission expires: __February 9, 2009__